UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SURGICORE, INC., an Illinois corporation, )
)
    Plaintiff, )
)
v. ) No. 03 C 2451
)
OFFICE OF PERSONNEL MANAGEMENT, ) Judge Rebecca R. Pallmeyer
)
    Defendant. )

## MEMORANDUM OPINION AND ORDER

Christy Prewitt, a federal employee, enrolled in the American Postal Workers Union Health Plan (the "Plan" or "APWU Plan"), which has a contract with the Office of Personnel Management ("OPM") to provide health insurance coverage to enrollees. The Plan reimburses enrollees for medical services, but excludes, among other things, procedures that are not medically necessary. On five separate occasions between April and June 2000, Plaintiff Surgicore, Inc. performed surgery on Ms. Prewitt's left and right feet. Surgicore, as Ms. Prewitt's assignee, submitted charges to the Plan for these surgeries totaling $31,440.31. The Plan denied Surgicore's request for benefits on the ground that the surgeries were not medically necessary, prompting Surgicore to appeal the Plan's decision to OPM under the Federal Employees Health Benefits Act ("FEHBA"). After OPM upheld the Plan's decision to deny benefits, Surgicore sued OPM in this court to recover the amount charged for Ms. Prewitt's surgeries. The parties' cross-motions for summary judgment are now before this court.[1]

---

[1] This court has jurisdiction pursuant to FEBHA section 8912. *See* 5 U.S.C. § 8912 (2006) ("The district courts of the United States have original jurisdiction . . . of a civil action or claim against the United States founded on this chapter."). Venue is proper under 28 U.S.C. 1391(b) because a substantial part of the events giving rise to Surgicore's claim occurred in this District. *See* Pl.'s Compl. ¶ 3.

## PROCEDURAL HISTORY

On April 11, 2003, after exhausting its administrative remedies, Surgicore filed a complaint against OPM with this court alleging that Ms. Prewitt's surgeries were medically necessary and should be covered by the plan. *See* Surgicore LR 56.1 Stmt. ¶ 48. Together with its answer, OPM submitted the Administrative Record ("AR") it considered in reviewing Plaintiff's administrative appeal. While the parties briefed their cross-motions for summary judgment, OPM enlisted an orthopedic surgeon (Dr. Robert W. Molinari) to review Surgicore's appeal pursuant to a medical review policy that OPM had instituted after Surgicore filed its complaint. *See id.* at ¶ 49. In a two-page report dated June 14, 2004, Dr. Molinari made "clinical findings" with respect to each of Ms. Prewitt's five surgeries and concluded that those surgeries were not medically necessary. Third Medical Review Analysis ("MRA"), AAR at 175–76. On OPM's own motion, the court remanded the case on June 30, 2004 to give Surgicore the opportunity to comment upon Dr. Molinari's conclusions. *See* Fed. Def.'s Motion for Voluntary Remand ¶ 8. As discussed more fully below, after reviewing some (but not all) of the materials Surgicore submitted on administrative remand, Dr. Molinari again concluded that Ms. Prewitt's surgeries were not medically necessary and OPM again denied Surgicore's appeal. The court then granted Surgicore's motion to reinstate this case on February 23, 2005, and OPM filed an Amended Administrative Record ("AAR") consisting primarily of materials related to OPM's post-remand review. The AAR does not incorporate materials included in the original AR and, consequently, this court cites to both the original and amended administrative records, as applicable.

## FACTUAL BACKGROUND

The relevant facts, based on the parties' Local Rule 56.1 statements and the administrative record, are as follows.

**1.      Ms. Prewitt's Surgeries**

This case turns on whether certain foot surgeries performed by Surgicore were "medically necessary" as defined by the Plan.[2]  On April 6, 2000, Ms. Prewitt met with Dr. Robert I. Steinberg, her doctor of 20 years, to schedule outpatient surgery to remove a "hypertrophic bone" from her left foot.  Surgicore LR 56.1 Stmt. ¶ 5.[3]  Surgicore would later explain that in 1982 Ms. Prewitt had suffered severe damage to her left foot when an "50 foot construction I-Beam [fell] directly onto her left foot."  *See* Surgicore Response to Medical Evaluation Prepared by Robert W. Molinari, M.D. (hereinafter "Surgicore Rebuttal Memo"), Ex. 1 to Supp. Amended Admin. Rec., at 1.  According to Dr. Steinberg, this injury resulted in numerous foot surgeries and subsequent surgical complications, including the "hypertrophic bone."  *Id.*  On April 11, 2000, Surgicore partially removed the bone from Ms. Prewitt's foot; the specific "[p]ost-operative findings were partial excision of 1st metatarsal left foot and sheath lengthening of EHL tendon left foot."  *Id.* at ¶ 6.  The

---

[2]      The Plan defines "medically necessary" as follows:

Services, drugs, supplies or equipment provided by a hospital or covered provider of health care services that the Carrier determines:

1)      are appropriate to diagnose or treat the patient's condition, illness or injury;
2)      are consistent with standards of good medical practice in the United States;
3)      are not primarily for the personal comfort or convenience of the patient, the family, or the provider;
4)      are not part of or associated with the scholastic education or vocational training of the patient; and
5)      in the case of inpatient care, cannot be provided safely on an outpatient basis.

The fact that a covered provider has prescribed, recommended, or approved a service, supply, drug or equipment does not, in itself, make it medically necessary.

*See* APWU Plan, AR Tab 1, at 36.

[3]      "Hypertrophy" is the enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 802 (28th ed. 1994).

Plan did not dispute the medical necessity of this initial surgery and paid Surgicore for its services to Ms. Prewitt. *See* Surgicore Rebuttal Memo at 1.

Ms. Prewitt's left foot showed symptoms of infection after surgery, prompting Dr. Steinberg to perform the first disputed surgery on April 21, 2000 "to have the wound on her left foot debrided." Surgicore LR 56.1 Stmt. ¶¶ 8–9. Specifically, the operation performed was "incision and drainage of infection left foot and debridement, and application of xenograft left food [sic]." *Id.* at 9.[4] The pre- and post-operative diagnoses were "deep post op infection left foot [and] wound dehiscence left food [sic]." *Id.* Tissue collected from Ms. Prewitt's foot and tested by the Illinois Masonic Medical Center Department of Pathology indicated "marked acute inflammation and bacterial colonization." *Id.* at ¶ 11. This surgery was not entirely successful as Ms. Prewitt still displayed signs of infection four days later, perhaps attributable to her failure to take the prescribed antibiotics. *Id.* at 13–15. This led to the second disputed surgery on April 26, 2000 to close the wound "in a primary fashion with sutures of 5-0 nylon." *Id.* ¶ 15. Cultures collected during this surgery revealed that the "staphylococcus species was still present." *Id.* at ¶ 17. Dr. Steinberg saw Ms. Prewitt on April 28, 2000 and advised her to continue taking her antibiotics, and by May 9, 2000 her wound had nearly closed. *Id.* at ¶¶ 18–19. Dr. Steinberg saw Prewitt again on May 13, 2000, noting that the wound "looked better and clean." *Id.* at ¶ 20.

Then, on May 19, 2000, Surgicore performed the third disputed surgery, this time on Ms. Prewitt's right foot for a separate condition: "synovitis and contracted digits (hammer toe)." *Id.* at

---

[4] A "wound dehiscence" is "separation of the layers of a surgical wound; it may be partial and superficial only, or complete, with disruption of all layers." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, *supra* note 3, at 436. "Debridement" is "the removal of foreign material and devitalized or contaiminated tissue from or adjacent to a traumatic or infected lesion until surrounding health tissue is exposed." *Id.* at 430. A "xenograft" is "a graft of tissue transplanted between animals of different species." *Id.* at 1849. Surgicore contends that a xenograft is "an FDA approved biological dressing used to promote healing." *See* Surgicore Rebuttal Memo, at 2.

¶ 21.[5] Surgicore asserts that Ms. Prewitt was complaining of pain in her right foot, *id.*, a claim OPM disputes. Dr. Steinberg's notes from a May 13, 2000 consultation make no specific reference to pain, instead indicating only that Ms. Prewitt "now wants digits 3 & 4 (R) straight." *See* Clinical Notes, AR Tab 13. In a letter addressed to APWU after Surgicore's claim was denied, Dr. Steinberg stated that Ms. Prewitt was complaining of pain in her right foot, and that another medical provider had previously attempted to correct Ms. Prewitt's condition without success. *See* Oct. 2000 Steinberg/APWU, AR Tab 3. When Dr. Steinberg examined Ms. Prewitt on May 20, 2000, the day after surgery, she showed no signs of infection in her right foot. *Id.* at ¶ 23.

Less than a week later, on May 25, 2000, Ms. Prewitt reported to Dr. Steinberg that her daughter had stepped on her right foot, and he noted that "fixative devices" used to correct two toes on her right foot were "impacted." *Id.* at ¶¶ 24–25. This mishap prompted the fourth disputed surgery on May 27, 2000 "to remove the dislodged fixative devices." *Id.* at ¶ 25. When Dr. Steinberg examined Ms. Prewitt on June 1, 2000, the condition in her right foot appeared corrected, but the wound on the left foot still had not completely closed. *Id.* at ¶ 27. On June 3, 2000, Dr. Steinberg examined Prewitt again, noting that the wound still had not closed and recommending "vinegar soaks." *Id.* at ¶ 28.

On June 7, 2000, Surgicore performed the fifth and final disputed surgery to repair the open wound on Ms. Prewitt's left foot. *Id.* at ¶ 29. The surgical report characterizes the procedure as "deep debridement of wound defect left foot with advancement flap to the area," and further indicates that the procedure was performed on the "dorsal aspect of the lft [sic] foot," utilizing "[m]ultiple sutures of 3-0 and 4-0 nylon." *Id.* A pathology report dated June 10, 2000 indicates that Ms. Prewitt's wound still showed "staphylococcus aureus" and "enterobacter cloacae." *See*

---

[5] "Synovitis" is "inflamation of a synovial membrane [lining of the joints]. It is usually painful, particularly on motion, and is characterized by a fluctuating swelling due to effusion within a synovial sac." *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, *supra* note 3, at 1645.

Pathology Report, AR Tab 13.[6] Follow-up examinations after this final surgery showed no infection, and, on June 27, 2000, Dr. Steinberg noted that her wound had closed. *Id.* at ¶ 31.

**2.      The Plan Denies Surgicore's Request for Reimbursement.**

Surgicore submitted Health Insurance Claim Forms ("HIC's") to the Plan for all five disputed surgeries for charges totaling $31,440.31. *See* OPM LR 56.1 Stmt. ¶ 2; HIC for 4/21/00, AAR at 112; HIC for 4/26/00, AAR at 116; HIC for 5/19/00, AAR at 120; HIC for 5/27/00, AAR at 125; HIC for 6/7/00, AAR at 129.[7] The HIC's identify the procedure and diagnosis for each disputed surgery using standardized "CPT" and "ICD-9" codes, *see, e.g.*, HIC for 4/21/00 (procedure codes "28001" and "15400," and diagnosis code "682.7"), which are defined in the American Medical Association Current Procedural Terminology (2000) ("CPT Manual") and International Classification of Diseases, 9th Revision, Clinical Modification ("ICD-9 Manual"), respectively. *See, e.g.*, ICD-9 Manual, AAR at 17, 23 (28001: "Incision and drainage, bursa, foot;" 15400: "Application of xenograft, skin; 100 sq cm or less"); CPT Manual, AAR at 43 (682.7: "Foot, except toes; Heel"). According to APWU, Surgicore's claims were reviewed by a "practicing physician of podiatry consultant from Integrity Plus, the Health Plan's Fraud and Abuse vendor." Reconsideration File, AR Tab 10.

On October 6, 2000, the Plan determined that Ms. Prewitt's surgeries did "not appear medically warranted based on the documentation provided." *See* Surgicore LR 56.1 Stmt. ¶ 32; Explanation of Benefits, AR Tab 2 (EOB's sent to Surgicore indicating that the five disputed

---

[6]      Staphylococcus aureus is a bacterium causing "serious supprative infections and systemic disease; they produce toxins that cause food poisoning and toxic shock syndrome." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, *supra* note 3, at 1572. Enterobacter cloacae is a species of bacteria that frequently causes infections "arising from contaminated medical devices and personnel." *Id.* at 558.

[7]      A brief note to clarify AAR citations. The AAR is consecutively paginated OPM 1–253. So, for example, the HIC for Ms. Prewitt's April 21, 2000 surgery is a one-page document appearing at Bates page 112.

surgeries "do not appear medically warranted."). Surgicore appealed the Plan's decision in October 2000,[8] enclosing a letter from Dr. Steinberg explaining why he believed the procedures were medically necessary and attaching "the operative reports, the pathology reports, as well as the culture and sensitivity reports" related to the procedures. *See* Surgicore LR 56.1 Stmt. ¶ 33; Oct. 2000 Steinberg/APWU Letter, AAR at 74–76. Dr. Steinberg also attached "copies of the insurance information and an itemized listing of the dates of services, procedure descriptions, and amounts charged." *Id.* at ¶ 37.

On March 21, 2001, the Plan upheld its prior decision to deny benefits, prompting Surgicore to ask OPM to review the Plan's decision. *See id.* at ¶ 38; Explanation of Benefits, AR Tab 4 ("Appeal Reviewed; Previous Denial Upheld."); *see also* Ohm/Castillo August 2001 Letter, AR Tab 8 (enclosing consent form executed by Ms. Prewitt authorizing Surgicore to file an appeal on her behalf). On September 17, 2001, in connection with Plaintiff's appeal, the Plan provided OPM with a "Reconsideration File" setting forth the Plan's rationale for denying benefits. *Id.* at ¶ 40. According to the Reconsideration File, a "board-certified, practicing physician of podiatry" had reviewed the medical records for Ms. Prewitt's surgeries and concluded that the surgeries were not supported by the documentation. *Id.* at ¶ 41. Specifically, the physician concluded that Surgicore's documentation was "vague and did not adequately describe the procedures billed, the size and location of the wound or the number of sutures used to close the wound." *Id.* at ¶ 42; Reconsideration File, AR Tab 10. The Reconsideration File goes on to note that "documentation in the medical records should support the [CPT] and [ICD-9] codes reported on the health insurance claim forms or billing statements," but they do not. Reconsideration File, AR Tab 10.

---

[8] Surgicore's cover letter appealing the Plan's decision is dated October 17, 2000, but enclosed a second letter from Dr. Steinberg dated October 27, 2000. *See* AR Tab 3. The parties agree, however, that Surgicore appealed the decision around this time period. *See* Surgicore LR 56.1 Stmt. ¶ 33

7

On September 27, 2001, OPM's own physician consultant reviewed the same documentation and concluded that there was "no medical record supporting the necessity of" any of the five disputed surgeries, noting that the certain documentation was missing or insufficiently detailed. *See* Surgicore LR 56.1 Stmt. ¶ 42; First Medical Review Analysis ("MRA"), AR Tab 11. On November 19, 2001, in response to a request from OPM, *see* Hentemann/Park Oct. 2001 Letter, AR Tab 12, Surgicore provided additional documentation concerning Ms. Prewitt's procedures. *See* Surgicore LR 56.1 Stmt. ¶ 45. OPM's physician consultant reviewed these additional materials and concluded that the record of Ms. Prewitt's surgeries still did "not contain any reasonable history or physical examination evidence that the surgeries on 4/21/00, 4/26/00, 5/19/00, 5/27/00 or 6/7/00 were medically necessary." Second MRA, AR Tab 14. The consultant further asserted that there was no evidence that "any conservative therapy was attempted before surgery" or of any "IV antibiotic administration," and that Ms. Prewitt was likely "not compliant with post-operative instructions." *Id.* On December 4, 2001, Toisha Faraji, an Insurance Benefits Claims Examiner, informed Surgicore's counsel that OPM had decided to uphold the Plan's denial of benefits. Faraji/Park Dec. 2001 Letter, AR Tab 15.

3.  **Surgicore Sues OPM Under FEHBA.**

On April 11, 2003, Surgicore filed a timely suit against OPM in this court alleging that Ms. Prewitt's surgeries were medically necessary and should be covered by the plan. *See* Surgicore LR 56.1 Stmt. ¶ 48. While the parties briefed their cross-motions for summary judgment, OPM asked Dr. Molinari, an orthopedic surgeon, to review Surgicore's appeal in accordance with a medical review policy that OPM initiated after Surgicore filed this lawsuit. *See id.* at ¶ 49. In a report dated June 14, 2004, Dr. Molinari made "clinical findings" with respect to each of Ms. Prewitt's five surgeries and concluded that those surgeries were not medically necessary. Third MRA, at 175–76. With respect to all five surgeries, Dr. Molinari found that Surgicore did "not properly document what was performed" and, specifically, that the ICD-9 and CPT codes were not

8

supported by the "operative notes as medically reasonable and necessary." *Id.* at 176. He went on to note that there was "no documentation of a deep wound infection or the size of the wound," and that "[i]n patients without vascular disease, these wounds can heal by secondary intention and wound dressing changes. There was no need for surgery in this patient based on what had been described." *Id.* Based on these findings, Dr. Molinari concluded that, contrary to the Plan's requirements, Ms. Prewitt's surgeries were (1) "not appropriate to diagnose or treat the patient's condition;" (2) "not consistent with standards of good medical practice in the United States;" and (3) "primarily for the personal comfort or convenience of the patient or the provider." *Id.* He further concluded that the "medical documentation" did not indicate the "size and location of the wound nor the number of sutures used during the reported surgery," nor did it describe the "clinical details of the patient's wound" or the "details of the procedure[s]," information that Dr. Molinari deemed "necessary and standard documentation for procedures performed on patients by medical professionals." *Id.* Dr. Molinari did not attach a copy of any "supporting scientific/medical literature;" the MRA form indicates only that such materials should be attached "as applicable." *Id.* at 176. On June 30, 2004, the court granted OPM's motion for voluntary remand to give Surgicore the opportunity to comment upon Dr. Molinari's conclusions. *See* Fed. Def.'s Motion for Voluntary Remand ¶ 8.

On August 4, 2004, OPM sent Surgicore a letter enclosing Dr. Molinari's review and inviting Surgicore to submit any comments or additional documents within 30 days. *See* Green/Goodman Aug. 2004 Letter, AAR at 173. Specifically, OPM informed Surgicore that, "[a]s agreed during the remand proceeding, if you still have concerns after reviewing Dr. Molinari's evaluation, OPM will accept comments and/or documents addressing those concerns." *Id.* Surgicore responded by letter dated September 4, 2004, enclosing pre- and post-operative x-rays of Ms. Prewitt's left and right feet for each date of service, "Laboratory Reports," Dr. Steinberg's office notes, and two documents filed with this court prior to OPM's voluntary remand: Plaintiff's response to OPM's Local

Rule 56.1 Statement, and Plaintiff's Memorandum of Law in Support of its Motion for Summary Judgment. *See* Wood/OPM Sept. 2004 Letter, AAR at 146–147. Surgicore also attached a memorandum entitled "Response to Medical Evaluation Prepared by Robert W. Molinari, M.D.," which attempted to rebut Dr. Molinari's conclusions, point-by-point. *Id.* In an email dated September 16, 2004, an OPM consultant named Kathleen Kazel indicated she had reviewed Surgicore's rebuttal memo and concluded that the points it raised were adequately addressed by Dr. Molinari's June 2004 MRA. *See* Kazel/Knight Sept. 2004 Email, AAR at 145.[9] This is the only indication in the administrative record that anyone at OPM reviewed this memo, and it appears that the document was never forwarded to Dr. Molinari for his consideration. Surgicore LR 56.1 Stmt. ¶ 61.

On October 7, 2004, OPM sent Surgicore a letter noting that Dr. Molinari had already reviewed the "clinical documents" enclosed with Plaintiff's September 4, 2004 letter. Faraji/Goodman Oct. 2004 Letter, AAR at 144. Significantly, however, OPM acknowledged that Surgicore had not previously provided the x-rays. *Id.* ("The clinical documents, *with the exception of the radiological films* . . . are duplicates of documents already contained in the file, which were reviewed by the medical consultant.") (emphasis added).[10] In this same letter, OPM again asked Surgicore to provide any additional information it wished OPM to consider, and specifically requested "narrative radiology reports for all x-rays performed from April 6, 2000 through August 24, 2000 (11 dates of service)." *Id.* On October 25, 2004, Surgicore sent OPM a letter attaching three narrative radiology reports, two dated May 19, 2000 (pre-and post-operative) and one dated May 27, 2000 (post-operative), which describe the x-ray images. Collins/OPM Oct. 2004 Letter,

---

[9]  The email is addressed to someone named Sharon Knight, but it is not clear from the record who this individual is or whether she is affiliated with the Plan or OPM.

[10]  The letter does not mention Surgicore's rebuttal memo.

AAR at 140–43. According to Ms. Collins' letter, these are the only narrative x-ray reports available pertaining to Ms. Prewitt's surgeries. *Id.*

When Dr. Molinari again reviewed Plaintiff's claims on December 7, 2004, the only additional information he considered were these three x-ray reports. Surgicore LR 56.1 Stmt. ¶ 61. He did not review Plaintiff's response to his June 14, 2004 MRA, nor did he consider the x-rays and legal memoranda that Surgicore had enclosed with its September 4, 2004 letter. *Id.* at 61. The three x-ray reports did not change Dr. Molinari's conclusion that Ms. Prewitt's surgeries were not medically necessary. *Id.* at ¶ 60. In a letter dated December 10, 2004, OPM informed Surgicore that it was denying Plaintiff's appeal based upon Dr. Molinari's conclusions. *Id.* at 62.

## DISCUSSION

Surgicore and OPM have filed cross-motions for summary judgment. Surgicore contends that OPM's consultant failed to consider all of the information that Surgicore submitted after remand, and that OPM's ultimate decision is contrary to evidence in the administrative record that Ms. Prewitt's surgeries were medically necessary. OPM contends that the review process was fair and thorough, and that it acted within its discretion in denying Plaintiff's appeal.

### A. Administrative Procedure Act ("APA") Standard of Review

Under regulations promulgated pursuant to FEHBA, *see* 5 U.S.C. § 8913 (2006), OPM is authorized to review health benefit claims that have been denied by the relevant benefit-plan carrier. 5 C.F.R. § 890.105 (2006). This court reviews OPM's decision to affirm APWU's denial of benefits deferentially, and will uphold that decision unless it is "found to be arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law." *See* APA, 5 U.S.C. § 706 (2006); *Harris v. Mutual of Omaha Co.*, 992 F.2d 706, 712 (7th Cir. 1993) (applying APA's "arbitrary and capricious" standard to OPM's decision to affirm denial of coverage for experimental cancer treatment). An agency's decision is arbitrary and capricious where, for example, the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its

11

decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assoc. of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Although the court will not substitute its judgment for OPM's, OPM's final determination is nevertheless subject to "searching and careful" review.  *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (overruled on other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977)).

**B.   OPM's Pre-Remand Review**

As a threshold matter, the court concludes OPM's post-remand determination that Ms. Prewitt's surgeries were not medically necessary is the relevant agency action for purposes of this court's review.  *See Camp v. Pitts*, 411 U.S. 138, 143 (1973)(validity of an agency's decision must "stand or fall" based upon the "contemporaneous explanation of the agency decision"); Faraji/Goodman Dec. 2004 Letter ("This is the final administrative review of this disputed claim by the Office of Personnel Management.").  The ultimate issue in this case is whether that determination "was based on consideration of the relevant factors and whether there has been a clear error of judgment."  *See Old Republic Ins. Co. v. Fed. Crop. Ins. Co.*, 947 F.2d 269, 282 (7th Cir. 1991) (citations and quotations omitted). Before reaching that issue, the court pauses to note that both parties have devoted a significant portion of their briefs to arguing the merits of particular assertions made during OPM's pre-remand review.[11]  For example, Surgicore points out that the "physician consultant" who drafted the First MRA noted that the charges for Ms. Prewitt's surgeries "appear to me to be very excessive," an opinion Surgicore contends was based on amounts typically charged by podiatrists, not "full service podiatry surgical center[s]" like Surgicore.  *See* Pl.'s Mem. at 19.  Even assuming that the consultant's criterion for assessing the cost of Ms. Prewitt's

---

[11]   Indeed, OPM focuses almost exclusively on the factors that it took into account in reaching its December 10, 2001 determination that Ms. Prewitt's surgeries were not medically necessary.

12

surgeries was incorrect, it has no bearing on OPM's ultimate conclusion that Ms. Prewitt's surgeries were not *medically* necessary. *See* Faraji/Goodman Dec. 2004 Letter. The case would be different if OPM used cost to justify its conclusion that the surgeries were not medically necessary, *see State Farm*, 463 U.S. at 43 (requiring a "rational connection between the facts found and the choice made")(citation and quotations omitted), but there is no indication that it did so here.[12] The medical consultant who reviewed Plaintiff's appeal in December 2001 also noted that Ms. Prewitt was apparently "not compliant with post-operative instructions." *See* Second MRA. While the court believes that the relationship between this observation and "medical necessity" is tenuous, at best, there is again no indication that it affected OPM's ultimate decision. It is likewise irrelevant that OPM initially considered the opinion of a "physician consultant" rather than an orthopedic surgeon, or that the first physician to review Plaintiff's appeal may not have considered all the available evidence. *See* Pl.'s Mem. at 17–18. These concerns were addressed at subsequent stages of OPM's review, and do not themselves impugn the conclusion that OPM ultimately reached. Similarly, Surgicore argues that purported flaws in the Plan's Reconsideration File should be imputed to OPM because OPM "unconditionally relied" upon the Plan's conclusions. *Id.* at 18. Clearly, OPM did not "unconditionally rely" on the Plan's conclusions as on four separate occasions OPM's own consultants reviewed materials Surgicore provided with its appeal. Accordingly, the court proceeds to an examination of agency's contemporaneous explanation for its decision to affirm the Plan's denial of benefits.

---

[12] The Plan does exclude coverage for "[c]harges that the Plan determines to be in excess of the reasonable and customary charge," *see* APWU Plan at 27, but that was not the reason the Plan and OPM ultimately denied Surgicore's claim. *See* Faraji/Goodman Dec. 2004 Letter.

**B.     OPM's Post-Remand Review**

In reaching its final determination, OPM relied on the "clinical findings" and conclusions that Dr. Molinari articulated for each disputed date of service. *See* Faraji/Goodman Dec. 2004 Letter. Surgicore points out that Dr. Molinari failed to "list or attach a copy of any scientific or medical literature to support his conclusions." *See* Pl.'s Mem. at 14. The court believes that Plaintiff's criticism misses the mark. Surgicore does not cite any statute or regulation requiring Dr. Molinari to base his conclusions on anything other than the record and his own expertise, and the MRA form states only that such additional materials should be attached "as applicable." *See* Third MRA, at 176. Evidently, Dr. Molinari concluded that additional documentation was not necessary and, indeed, neither party cited "scientific or medical literature" to support their respective positions. OPM's decision to rely on Dr. Molinari's expertise, standing alone, is not arbitrary and capricious.

Plaintiff's arguments addressed to the weight of the medical evidence in the record are likewise misguided. Surgicore contends that OPM ignored laboratory reports indicating that Ms. Prewitt's left foot was "seriously infected." See Pl.'s Mem. at 14. OPM did not dispute that Ms. Prewitt's foot was infected; rather, it disputed whether the infection warranted surgery. *See, e.g.*, June 2004 MRA, at 64 ("CPT code 15400 [application of xenograph skin] is not medically reasonable and necessary because the procedure is not indicated *when there is an infection*.") (emphasis added). Based upon the type of infections disclosed in the laboratory reports (e.g., staphylococcus), Surgicore asserts that OPM's consultants must have ignored those reports because it is "inconceivable" that OPM could have concluded "in good faith" that the procedures were not medically necessary. *See* Pl.'s Mem. at 14. But Surgicore fails to explain why the type of infection, though no doubt serious, necessitates surgery rather than some other form of intervention. The Plan's medical consultant and two OPM medical consultants—including one orthopedic surgeon—concluded otherwise. *See Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985)(overruled on other grounds by *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101

(1989) (Under the arbitrary and capricious standard, "[a]ny of questions of judgment are left to the agency."). It is not the court's role to second-guess those conclusions. *See Patterson v. Caterpillar, Inc.*, 70 F.3d 503, 506 (7th Cir. 1995).

Plaintiff's assertion that OPM did not consider all the available evidence is more troubling. *See State Farm*, 463 U.S. at 43 (1983)(an agency acts arbitrarily and capriciously when it "entirely fail[s] to consider an important aspect of the problem."); *Morall v. Drug Enforcement Agency*, 412 F.3d 165, 178 (D.C. Cir. 2005)(agency acts arbitrarily and capriciously when it ignores relevant testimony). First, Surgicore asserts that OPM ignored evidence in the record that the "fixative devices" used to correct problems with Ms. Prewitt's right foot were "impacted," necessitating surgery. *See* Pl.'s Mem. at 15. In concluding that the surgery was not medically necessary, Dr. Molinari observed that the pathology report described the "pins . . . as being bent at one end." *See* Third MRA at 65. Based on this information, and the fact that the pins were placed in Ms. Prewitt's toes only a week before the fourth disputed surgery, Dr. Molinari concluded that the pins "should [have been] removed at bedside or in the office because they are superficial." *Id.* On September 4, 2004, Surgicore submitted x-ray evidence to OPM that might have resolved the apparent discrepancy between the pathology report and Dr. Steinberg's office notes. *See* Wood/OPM Sept. 2004 Letter, AAR at 146. While it is unclear whether OPM ever transmitted the x-rays to Dr. Molinari, or if he was even aware that they existed, it is clear that he did not review the x-rays. *See* Pl.'s LR 56.1 Stmt. ¶ 61. Nor does it appear that anyone else at OPM reviewed the x-rays other than to note that Surgicore had provided them. *See* Kazel/Knight Sept. 2004 Email, AAR at 145.

In its rebuttal to Dr. Molinari's initial report, Surgicore underscored its belief that these x-rays were critical to OPM's determination, but Dr. Molinari did not review this rebuttal document either. *See* Surgicore Rebuttal Memo at 3 ("There are both pre and post operative x-rays showing the placement of the devices and the need for surgical intervention."); Pl.'s LR 56.1 Stmt. ¶ 61. OPM cites an internal email and contends that even if Dr. Molinari did not read Plaintiff's rebuttal, a

15

"Nurse Reviewer" did, and concluded that "[p]oints raised by the Provider in this document, had been addressed in the consultant's review of 06/14/04." *See* Kazel/Knight Sept. 2004 Email. Some of the information contained in Plaintiff's rebuttal memo could not have been addressed in Dr. Molinari's June 2004 review, as the rebuttal memo relies on information added to the record in September 2004. *See* Surgicore Rebuttal Memo at 3 (discussing x-rays enclosed with Plaintiff's September 4, 2004 letter). In addition, Surgicore conceded in that rebuttal document that its HIC's included several incorrect CPT codes, and included what it believed were the correct codes. *Compare* Surgicore Rebuttal Memo at 2–3 (conceding that codes 28052 & 28010 were incorrect) *with* Third MRA at 2 ("The record does not support the use of CPT codes 28052 & 28010."). While it is unclear whether this additional information would have altered Dr. Molinari's ultimate conclusion, he should nevertheless have reviewed that information.

Indeed, the avowed purpose of voluntary remand was to allow Surgicore to comment upon Dr. Molinari's conclusions. *See* Fed. Def.'s Motion for Voluntary Remand ¶ 8. The thrust of Plaintiff's comments, at least as they concern the surgeries to repair the wound on Ms. Prewitt's left foot, is that Ms. Prewitt required special care based upon her prior medical history. *See* Surgicore Rebuttal Memo ("[S]urgery was deemed medically necessary due to the Patient's compromised problems for healing relating to the multiple bone grafts."). And with respect to the second surgery on her right foot, Surgicore asserts that the pins were "impacted" by the accident involving Ms. Prewitt's daughter and could no longer be removed "bedside." *See id.* (Ms. Prewitt's accident rendered it improper to compare Ms. Prewitt's situation to "other normal, non-incidental situations."). The court does not express any opinion about whether these exigencies should persuade OPM's consultant that Ms. Prewitt's surgeries were necessary, but they ought to have been considered and addressed.

Finally, OPM appears to suggest that poor documentation is, in and of itself, inconsistent with "standards of good medical practice in the United States," *see* APWU Plan at 27, and is

therefore a sufficient basis for concluding that Ms. Prewitt's surgeries were not medically necessary. *See* Def.'s Response to Pl.'s Motion for Summ. J. at 2. For example, OPM points out that the "operative" and "office" notes do not indicate the size of Ms. Prewitt's wound, and therefore Surgicore's use of CPT Code 15400 ("xenograft . . . 100 sq cm or less") for the April 21, 2000 surgery, and 14040 ("tissue transfer . . . defect 10 sq cm or less") for the April 26, 2000 surgery, are not supported. First, and most importantly, OPM's interpretation of the Plan does not excuse it from considering all relevant documentation provided by Surgicore.[13] Second, under the plain language of the Plan, "standards of good medical practice" applies to "*services, drugs, supplies or equipment* provided by a hospital or covered provider of health care services." *See* APWU Plan at 36 (emphasis added).[14] As the court understands those identified standards, they do not contemplate that poor documentation, standing alone, will be a basis for concluding that a procedure is not "medically necessary" as the Plan defines that term. Of course, inadequate documentation may impair the Plan's or OPM's ability to assess whether particular "services, drugs, supplies or equipment" are consistent with "standards of good medical practice." *Id.* But until OPM has reviewed all the relevant information in the administrative record, it cannot reasonably conclude that the record is inadequate or properly bring its expertise to bear on the issues raised by Plaintiff's appeal.

---

[13] Conceivably, OPM is concerned with contemporaneous documentation only, but there is no such requirement in the Plan, nor was such a requirement ever discussed with or communicated to Surgicore. *See Bagdonas v. Dept. of Treasury*, 93 F.3d 422, 426 (7th Cir. 1996) (The reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given."); *cf. Harris*, 992 F.2d at 713 (benefits plan explicitly defined "reliable evidence" that the reviewer could consider in determining whether a disputed treatment was experimental and therefore not covered).

[14] The Plan goes on to state that the fact that "a covered provider has *prescribed, recommended, or approved* a service, supply, drug or equipment does not, in itself, make it medically necessary." *See* APWU Plan at 36 (emphasis added).

The court concludes that OPM arbitrarily and capriciously ignored information relevant to Plaintiff's appeal. The appropriate remedy where the agency has failed to consider all relevant evidence is "to remand to the agency for additional investigation or explanation." *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). Accordingly, the court declines Plaintiff's request that the court direct OPM to require the Plan to pay the disputed claim. *See* Pl.'s Response in Opp'n to Def.'s Motion for Summ. J. at 6. The case is remanded to OPM to consider all relevant materials Surgicore has produced for OPM's review, including the x-rays and Plaintiff's rebuttal memo. Consistent with OPM's own statements concerning its current medical review policy, *see* Fed. Def.'s Motion for Voluntary Remand ¶ 8, these materials should be reviewed by an orthopedic surgeon.

## CONCLUSION

Plaintiff's motion for summary judgment (36) and Defendant's motion for summary judgment (39) are denied, and the case is remanded to OPM for further evaluation consistent with this opinion.

ENTER:

Dated: March 21, 2006  _____
REBECCA R. PALLMEYER
United States District Judge